ORIG-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

       - v. -

JOHN EVERS,

                      :

            Defendant.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____   INFORMATION
DATE FILED: JUL 19 2007

07 Cr.

07 CRIM. 687

*JUDGE KARAS*

## COUNT ONE

(Conspiracy to Commit Bank Fraud, Mail
Fraud, and Securities Fraud)

The United States Attorney charges:

### Introduction

    1.   At all times relevant to this Information:

       a.  JOHN EVERS, the defendant, was the principal of a business named First Place Financial Services ("First Place"), located in Vernon, New Jersey.  First Place purported to be, at various points in time, either a network of business consultants which provided professional services, including accounting services, telemarketing, venture capital, computer services and utility auditing, or an Internet technology company.

       b.  Gary J. Confredo, a co-conspirator not named as a defendant herein, was a purported independent financial consultant who offered to assist individuals in securing business financing.  Confredo operated businesses at various times under the names Granite Management Services; Moonlit Consultants, Inc.; Tristate Management; GJC Financial Resources, Inc.; Slim Line

Financial; and Comark Financial Services Group.  JOHN EVERS, the defendant, was a customer of Gary J. Confredo.

c.    Jordan Drew, a co-conspirator not named as a defendant herein, operated S. J. Windsor Capital Partners ("Windsor Capital"), located in Westbury, New York.  Windsor Capital purported to be a corporate finance and investment banking advisory service which provided information about private companies planning to "go public" and offering investment opportunities to the general public.  The investment opportunities offered by Windsor Capital included private placements of non-public securities that were to be purchased directly from the issuing company.

2.    At all times relevant to this Information:

a.    Cyberweb Café, Inc. ("Cyberweb Café") was the corporate successor of First Place.  In or about June 1996, First Place completed a statutory merger with Cyberweb Café, a Delaware corporation created in or about 1996.  Cyberweb Café purported to be a new internet coffee house located in New City, New York, offering internet services to inexperienced consumers in a "warm café atmosphere."

b.    At all times relevant to this Information, Citibank, N.A., Fleet Bank, N.A., Midlantic Bank, N.A., and North Fork Bank, were banking corporations, the accounts of which were insured by the Federal Deposit Insurance Corporation.  Among

2

other things, Citibank, N.A., Fleet Bank, N.A., Midlantic Bank, N.A., and North Fork Bank were in the business of providing business loans to companies which met, or appeared to meet, the bank's lending qualifications.

### The Fraudulent Loan Scheme

3.    Gary J. Confredo ran businesses which purportedly sought to "assist" customers in obtaining commercial loans from financial institutions and other entities.  Confredo's customers, however, needed Confredo's "assistance" because they were unable to secure financing through traditional sources, which, for various reasons, did not regard them or their businesses as creditworthy.  JOHN EVERS, the defendant, was one such customer and EVERS retained Confredo to obtain financing for First Place. Confredo typically charged between five and fifteen percent of the loan amount as his fee.

4.    In order to induce financial institutions and commercial lenders to lend funds to his customers (such as JOHN EVERS), Gary J. Confredo and his co-conspirators created false and fictitious financial documents.  As a result of his prior experience as a commercial loan officer at a financial institution, Confredo was familiar with some of the standards that financial institutions used to evaluate business loan applications, and the level of financial performance and/or

profitability that financial institutions would require before extending loans in given amounts.  Using this experience, Confredo created a three-year set of financial statements for First Place which inflated First Place's profitability in order to induce various financial institutions and other commercial lenders to extend various types of commercial loans to First Place.

5.    Gary J. Confredo then recruited an accountant to generate three years' worth of purportedly authentic corporate income tax returns for First Place and personal federal income tax returns in the name of JOHN EVERS, the defendant, and his spouse.  The figures on those fraudulent returns were consistent with the figures Confredo had used in the fraudulent financial statements that he had created.

6.    JOHN EVERS, the defendant, and Gary J. Confredo then submitted and caused to be submitted the false and fraudulent financial statements and federal income tax returns to commercial lenders -- Midlantic Bank, Citibank, Fleet, Key Credit Corporation, Colonial Pacific Leasing, Advanta Leasing, and Lease Funding Center (collectively "the Lenders") -- in support of a series of commercial loan applications made in the name of First Place.

7.    By in or about the fall of 1995, Confredo had assisted JOHN EVERS, the defendant, in obtaining approximately

4

$500,000 in commercial financing from the Lenders in the name of First Place based upon fraudulent financial statements and false income tax returns that Confredo and his associates prepared. Although EVERS used some proceeds from subsequently obtained loans to pay off earlier loans, by in or about the Spring of 1996 First Place had amassed a net outstanding debt of approximately $350,000.

### The Fraudulent Private Placement Scheme

8.    At all times relevant to this Information, an exemption available under the Securities Act of 1933, as well as Regulation D of the rules and regulations of the Securities and Exchange Commission ("SEC"), provided that, subject to certain limitations, a corporation could sell a limited amount of its securities in a private placement directly to investors without first registering those securities with the SEC.

9.    In or about June 1996, Jordan Drew and JOHN EVERS, the defendant, agreed to raise approximately $1 million by issuing a private placement offering for First Place pursuant to Regulation D ("the Private Placement"). In or about June 1996, in order to induce potential investors to subscribe to the First Place Private Placement offering, Drew and EVERS changed First Place's name to the Cyberweb Café and also changed the corporation's purported business from offering professional financial services to a restaurant café with an internet theme.

10.    JOHN EVERS, the defendant, and Jordan Drew agreed that EVERS would use approximately a third of the $1 million Private Placement offering to pay off approximately $350,000 in outstanding debt that First Place owed commercial lending institutions, and that the balance of the proceeds would be divided evenly between the payment of sales commissions to Windsor Capital for selling the Private Placement and the payment of expenses related to opening and operating the Cyberweb Café. EVERS and Drew agreed that it was essential for the success of the conspiracy to open and operate the Cyberweb Café.

11.    In or about June 1996, Jordan Drew prepared a private placement memorandum for the Cyberweb Café using a private placement memorandum package for the Cyber Java Café in Hollywood, California.  The Cyberweb Café private placement memorandum described the company and purported to advise investors of certain risks associated with the offering.  In addition, the private placement memorandum contained a section entitled "Use of Proceeds," which represented to investors how the offering proceeds would be used.  In this regard, the private placement memorandum, dated approximately August 1, 1996 (the "Cyberweb Memorandum") stated, among other things, that Cyberweb Café was offering 200,000 shares of common stock at $5.00 per share, for  total gross proceeds of $1 million.  The Cyberweb Memorandum falsely represented that the net cash proceeds of the

offering to be received by the Cyberweb Café would be $900,000,
after deducting approximately $100,000, or 10 percent of the
offering proceeds to pay costs associated with the Private
Placement Offering.  It also stated that the $900,000 balance
would be used for the expenses of opening the café, including,
among other items, the purchase of the computer equipment
consistent with the internet theme.  In fact, however, Drew and
JOHN EVERS, the defendant, had agreed instead that (i)
approximately one third of the total funds to be raised
(approximately $330,000) would go to Drew and his company Windsor
Capital as commissions for selling the Private Placement, and
(ii) little more than one third would be used to pay off the
$350,000 in commercial debt EVERS had already amassed in the name
of First Place, leaving less than one third of the amount raised
to be used for opening and operating the café.

        12.    The Cyberweb Memorandum also contained a six month
financial statement for First Place, for the period December 31,
1995 to June 30, 1996, which purported to show that First Place
had already established a record of profitability.  In fact,
First Place had no such record of profitability.  The financial
statement was entirely fraudulent and had been invented earlier
by Gary J. Confredo for JOHN EVERS, the defendant, to submit in
support of the loans that First Place had fraudulently obtained
from commercial lending institutions.

13.    From on or about August 1, 1996 to in or about
October 1997, based upon these fraudulent representations, JOHN
EVERS, the defendant, Jordan Drew and others, caused
approximately 124 individuals and entities to invest
approximately $900,000 in the Cyberweb Café, Inc., including
investors located in New York, New York.  A number of the
investors had their Cyberweb stock delivered to and held by the
following securities firms located in New York, New York:  Dean
Witter Reynolds, Prudential Securities, Bankers Trust, National
Financial Services, and National Investor Services.

14.    From in or about August 1996 through in or about
October 1997, JOHN EVERS, the defendant, pursuant to the illegal
arrangements described above, diverted approximately $343,000 in
proceeds of the Private Placement to pay Jordan Drew and Windsor
Capital commissions for the sale of Cyberweb Café common stock.

15.    From in or about August 1997 to on or about
January 21, 1998, JOHN EVERS, the defendant, and others opened
and operated the Cyberweb Café before it was forced to close
because of inadequate funding.

### The Statutory Allegations

16.    From in or about September 1995 through in or
about February 1998, in the Southern District of New York and
elsewhere, JOHN EVERS, the defendant, and others known and
unknown, unlawfully, willfully, and knowingly combined,

8

conspired, confederated and agreed together, and with each other, to commit offenses against the United States, to wit, bank fraud, in violation of Title 18, United States Code, Section 1344; mail fraud, in violation of Title 18, United States Code, Section 1341; and securities fraud, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Title 17, Code of Federal Regulations, Section 240.10b-5.

17.    It was a part and an object of the conspiracy that JOHN EVERS, the defendant, and others known and unknown unlawfully, willfully, and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud financial institutions, and to obtain money, funds, credits, assets, securities, and other property owned by and under the custody and control of financial institutions, by means of false and fraudulent pretenses, representations and promises, in violation of Title 18, United States Code, Section 1344.

18.    It was a further part and an object of the conspiracy that JOHN EVERS, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting to do so, would and did place in post offices and other authorized depositories

for mail matter, and deposit, and cause to be deposited, matters and things to be sent and delivered by the United States Postal Service and by private and commercial interstate carriers, would and did take and receive such matters and things therefrom, and would and did knowingly cause such matters and things to be delivered by mail and by private and commercial interstate carriers, according to the directions thereon, and at the places at which they were intended to be delivered by the persons to whom they were addressed, in violation of Title 18, United States Code, Section 1341.

19.    It was a further part and an object of the conspiracy that JOHN EVERS, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by Cyberweb Café in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making and causing to be made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which

operated and would operate as a fraud and deceit upon the
purchasers of Cyberweb Café securities, in violation of Title 15,
United States Code, Sections 78j(b) and 78ff.

### Overt Acts

20.    In furtherance of this conspiracy and to effect
its illegal objects, JOHN EVERS, the defendant, and others known
and unknown, committed the following overt acts, among others, in
the Southern District of New York and elsewhere:

a.  On and about September 21, 1995, Gary J.
Confredo negotiated an approximately $5,000 check issued by JOHN
EVERS, the defendant, drawn on an account at the Bank of New
York.

b.  On or about December 22, 1995, JOHN EVERS, the
defendant, issued a check in the amount of approximately $15,860
to Moonlit Consultants, which check had been drawn on an account
in the name of First Place at Midlantic Bank and which had been
funded with a loan to First Place from Midlantic Bank.

c.  On or about May 31, 1996, JOHN EVERS, the
defendant, caused an approximately $50,000 check drawn on the
account of S. J. Windsor Capital Partners, LLP to be deposited
into an account in the name of Cyberweb Café, Inc., at Fleet
Bank.

d.  On or about June 11, 1996, JOHN EVERS, the
defendant, and others caused an attorney to send a fax to the

CUSIP Service Bureau located at 25 Broadway, New York, New York, requesting that it issue a new CUSIP number for the corporate stock Cyberweb Café intended to issue by a private placement offering.

      e.    On or about July 12, 1996, an associate of Gary J. Confredo faxed Jordan Drew copies of fraudulent 1995 and 1996 First Place financial statements, previously created by Confredo, for use in the Cyberweb Private Placement memorandum.

      f.    From on or about August 1, 1996 to in or about October 1997, JOHN EVERS, the defendant, Jordan Drew, and others, caused approximately 124 individuals and entities to invest approximately $900,000 in the Cyberweb Café, Inc., including investors located in New York, New York.

      g.    From on or about August 1, 1996 to in or about October 1997, JOHN EVERS, the defendant, Jordan Drew and others, caused Cyberweb stock to be delivered to, and held by, the following securities firms located in New York, New York:  Dean Witter Reynolds, Prudential Securities, Bankers Trust, National Financial Services, and National Investor Services.

      h.    From on or about June 13, 1996 to on or about May 15, 1997, JOHN EVERS, the defendant, issued approximately 130 checks totaling approximately $343,415, drawn on the account of Cyberweb Café, Inc. at Fleet Bank, to Jordan Drew and various

12

third parties for payment of Windsor Capital "commissions" on the sale of approximately $900,000 of Cyberweb Café shares.

i.  From in and about August 1997 to on or about January 21, 1998, JOHN EVERS, the defendant, and others opened and operated the Cyberweb Café at 61 South Main Street, New City, New York, until it was forced to close because of a lack of funding.

(Title 18, United States Code, Section 371.)


_Michael J. Garcia_
MICHAEL J. GARCIA
United States Attorney

13